AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. **3:19 mj 525** |
| THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (937) 301-3961, THAT IS STORED AT PREMISES CONTROLLED BY SPRINT | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A. This court has authority to issue this warrant under 18 U.S.C. sections 2703(c)(1)(A) and 2711(3) (A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized):*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| 21 USC. § 841(a)(1) & 846 | Conspiracy to possess with intent to distribute a controlled substance. |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Dennis Eng, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9-4-19

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **(937) 301-3961**, THAT IS STORED AT PREMISES CONTROLLED BY SPRINT | Case No. _____ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Dennis C. Eng, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for

information associated with a certain cellular telephone assigned call number **937-301-3961**,

("the **SUBJECT PHONE**"), that is stored at premises controlled by Sprint, a wireless telephone

service provider, headquartered at 6480 Sprint Parkway, Overland Park, KS 66251. The

information to be searched is described in the following paragraphs and in Attachment A. This

affidavit is made in support of an application for a search warrant under 18 U.S.C. §

2703(c)(1)(A) to require Sprint to disclose to the government copies of the information further

described in Section I of Attachment B. Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review the information to locate items

described in Section II of Attachment B.

2.    I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and

have been since July 19, 1998. I have been involved in narcotics related arrests; the execution of

search warrants, which resulted in the seizure of narcotics; and supervised the activities of

informants who provided information and assistance resulting in drug buys. Since 1998, I

received training and experience in interviewing and interrogation techniques; arrest, search and seizure procedures; narcotics investigations; and various other criminal investigations resulting in successful prosecution. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting narcotics investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity. I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call or send a text message to the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls or text messages from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. I have also encountered the practice of traffickers fielding calls from drug customers and directing those customers to "drug houses" which are used to store, package, and sell narcotics.

2

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by Cory MARTIN.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

5.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.     The United States, including the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and the Federal Bureau of Investigation (FBI), are conducting a criminal investigation of Corey MARTIN and Thomas CREECH  for possible violations of Title 21 U.S.C. §§ 841 and 846.

7.     ATF has a confidential informant (hereinafter referred to as "CI") whose identity is documented by ATF and is known to agents.  The CI is currently on bond in a criminal case and continues to successfully meet his/her terms and conditions of bond as set forth by the court and the probation department.  The CI has continued to provide reliable and actionable information since his/her release on bond several months ago.  The ATF CI is currently assisting

ATF with multiple Federal criminal investigations. Information provided by the CI has been corroborated throughout the course of multiple Federal investigations. Information provided by the ATF CI and actions of the CI at the direction of ATF, have resulted in obtaining physical evidence of Federal criminal violations. The CI has admitted to ATF and law enforcement that he/she has utilized and purchased Methamphetamine in the past for distribution.

8. The CI identified his/her source of supply for methamphetamine was an individual named "Tommy C". "Tommy C" was later identified by law enforcement as Thomas CREECH II (referred hereinafter as CREECH). The CI has known CREECH since approximately January 2017. The CI told agents that he/she had purchased approximately twenty (20) times usually purchasing a half (½) pound of methamphetamine at a time. Some of these past purchases of methamphetamine occurred at CREECH's residence, which the CI identified as being 2016 Troy Street, Dayton, Ohio.

9. The CI described CREECH as a "middleman" and believed one of CREECH'S sources of the methamphetamine was being provided by a black male, who the CI identified as "WATERBOY". "WATERBOY" was later identified by law enforcement as Cory MARTIN (referred hereinafter as MARTIN). The CI told law enforcement that on past occasions, he/she would advise CREECH the amount of methamphetamine he/she wanted to purchase. CREECH would then in turn contact MARTIN who would then deliver the requested amount of methamphetamine to CREECH for the CI to purchase. The CI has observed CREECH contact MARTIN via telephone and he/she had been present during the delivery of the methamphetamine. The CI further stated he/she had seen MARTIN with a pistol during past methamphetamine transactions and believed the pistol to be a Glock.

4

10. On or about January 31, 2019, at the direction of ATF, the CI placed a recorded cellular telephone call to CREECH. The CI had provided CREECH's number to law enforcement as the phone number that the CI has previously used to contact "Tommy C", and who was later identified by the CI as CREECH from the voice on the call. During the course of the call, the CI spoke with CREECH and indicated he/she would meet with CREECH the following day at approximately 2:00 pm for the purpose of purchasing drugs. Based on that call, law enforcement intended to conduct a controlled operation at the meet and believed that the meet location was going to occur at 2016 Troy Street, Dayton (CREECH's residence) based on prior meetings between the CI and CREECH.

11. On or about February 1, 2019, at the direction of ATF, the CI sent multiple text messages to CREECH prior to the ATF controlled operation. The CI contacted CREECH and, using coded language, indicated he/she wanted to purchase three (3) ounces of methamphetamine for $500 per ounce. The CI messaged, "Hey I got make it quick and fast u get me 3 I'm by Walmart... I got 5 a piece for u it's time to make it rain..."

12. On or about February 1, 2019, I met with participating law enforcement officers and agents at a briefing location to discuss the operation. After the brief was complete, ATF Special Agent (SA) Christopher Reed and I, along with an ATF Under Cover (UC) Agent, traveled to a separate staging location to meet with the CI. While at this location, a search of the CI's person was conducted for contraband and weapons. The search produced negative results. The CI was provided with an electronic transmitting /recording device and prerecorded buy money to purchase the first two ounces of methamphetamine. After this, the CI got into the UC's vehicle and the UC left the staging location

5

13.    SA Reed and I surveilled the UC's vehicle from the staging location to CREECH's residence of 2016 Troy Street, Dayton, Ohio.  At approximately 3:01 pm, the CI and UC arrived at the target location and the CI proceeded into the residence. The UC remained in the vehicle. Once inside, the CI spoke with CREECH for a period time. During the course of the conversation, the CI asked CREECH if he was ready to "make it rain". CREECH told the CI, not yet, that it would be another 10 minutes.

14.    At approximately 3:15 pm, surveillance units observed a grey Chevrolet Impala bearing Ohio license plate number FND7094 (hereinafter referred to as MARTIN's Impala) arrive at the residence and park near the UC vehicle. A heavyset black male, later identified by the CI and UC as MARTIN, exited the vehicle and proceeded into the residence.

15.    The CI greeted MARTIN and asked him what was up. When the CI indicated he/she had additional money, MARTIN commented that he would need an additional 15 minutes to go and get it. The CI asked MARTIN if he had the two (referring to the 2 ounces of methamphetamine). MARTIN replied, yeah. The CI exchanged the $1000.00 of buy funds for the two ounces of suspected methamphetamine. MARTIN told the CI to give him 15 to 20 minutes due to the fact he had to run to the west side real quick.

16.    At approximately 3:19 pm, MARTIN exited the residence and returned to the MARTIN's Impala. Surveillance units observed MARTIN's Impala exit the residence's parking lot and travel south on Troy Street. Law enforcement surveilled MARTIN to 217 Westwood Avenue, Dayton, Ohio.

17.    The CI continued to converse with CREECH and the other occupants of the residence while awaiting MARTIN to return.  During this time, the CI exited the residence and

6

returned to the UC's vehicle to retrieve the additional $500.00 of buy funds. After a brief conversation with the UC, the CI re-entered the residence.

18.     At approximately 3:34 pm, MARTIN arrived at the Westwood location and was believed to have entered the residence. (Based on the location of the residence, surveillance was unable to observe MARTIN entering the location.) At approximately 3:41 pm, MARTIN was believed to have exited the residence and entered his Impala. Law enforcement surveilled the Impala from the Westwood location back to CREECH's residence, where it arrived at approximately 3:50 pm. Upon returning to the residence, MARTIN delivered what appeared to the CI to be several ounces of suspected methamphetamine to CREECH.

19.     At approximately 3:52 pm, MARTIN was observed by law enforcement leaving the residence and then leaving the area in the Impala. Surveillance on MARTIN was terminated shortly thereafter.

20.     While still inside the residence, CI exchanged $500.00 of buy funds with CREECH for one additional ounce of suspected methamphetamine. After advising he/she was leaving, the CI asked CREECH if he wanted to meet the UC. When CREECH indicated that he would, the CI told CREECH he/she would wait for CREECH outside. A short time later, CREECH exited the residence and approached the UC's vehicle. During the brief conversation, the UC introduced himself/herself to CREECH. Once the conversation was complete, the UC and CI left the target area and proceeded back to a debrief location.

21.     Law enforcement took custody of the suspected methamphetamine from the CI and placed into property at the Montgomery County Sheriff Office property room. The suspected methamphetamine was later sent to the Miami Valley Regional Crime Laboratory (MVRCL) for analysis. MVRCL report dated March 4, 2019 confirmed the substance submitted

7

was in fact methamphetamine with a net weight of 27.86 grams +/- 0.02 gram(s) and 56.52 grams +/- 0.04 gram(s).

22.     On or about February 5, 2019, an administrative subpoena was served to Dayton Power and Light (DP&L) for utility subscriber information at 2016 Troy Street, Dayton, Ohio. On or about that same date, DP&L responded that the address is listed under the Estate of Thomas P. Creech.

23.     On or about February 13, 2019, at the direction of ATF, the CI place a recorded cellular telephone call to CREECH, to further coordinate a methamphetamine purchase for the following day. During the course of the call, the CI indicated he/she would meet with CREECH at 1:00 pm or 2:00 pm on February 14, 2019.  CI told CREECH, "I'll probably just get the same thing…" The call soon concluded.

24.     On or about February 14, 2019, I met with participating law enforcement officers and agents at a briefing location to discuss the operation. After the brief was complete, SA Reed and I, along with the UC, travelled to a separate location to meet with the CI. While at this location, a search of the CI's person was conducted for contraband and weapons. The search produced negative results. The CI was provided with an electronic transmitting/recording device and prerecorded buy money to purchase the three ounces of methamphetamine.  The CI entered the UC's vehicle, who drove away from the staging location.

25.     SA Reed and I surveilled the UC's vehicle from the staging location to CREECH's residence of 2016 Troy Street, Dayton, Ohio. At approximately 2:03 pm, the CI and UC arrived at the target location and the CI proceeded into the residence. Upon entering the residence, the CI briefly spoke with CREECH and then followed CREECH to a bedroom area of the residence. CREECH advised the CI that he (CREECH) had recently sold his residence. Later

8

in their conversation, the CI asked CREECH when CREECH expected to move out of the residence. CREECH told the CI that he had to be out of that location within fourteen (14) days.

26.     At approximately 2:27 pm, the CI observed CREECH place a phone call to an individual believed to be MARTIN. During the call, the CI could overhear both speakers on the call. The CI heard CREECH asked MARTIN if he (MARTIN) had an e.t.a. (estimated time of arrival). MARTIN told CREECH that he was waiting on his sister to pull up. MARTIN then asked CREECH how many he needed. CREECH responded, three. MARTIN told CREECH, all right, and the call soon concluded.

27.     At approximately 2:53 pm, the CI observed CREECH place a phone call to an individual believed to be MARTIN. During the call, MARTIN advised that he was about to pull up. The call soon concluded.

28.     At approximately 2:56 pm, surveillance units observed MARTIN's Impala pull into the rear of CREECH's residence (2016 Troy Street, Dayton, Ohio). MARTIN exited the driver's side of the vehicle wearing a red sweatshirt and dark knit hat, entered the residence and made contact with CREECH. The CI observed MARTIN and CREECH go into a different area inside the residence to meet. After both individuals emerged from their brief meeting, MARTIN left the residence. CREECH then exchanged a plastic bag containing the three (3) ounces of suspected methamphetamine with the CI for the pre-recorded buy funds.

29.     At approximately 3:00 pm, surveillance units observed MARTIN exit the residence and return to his Impala. MARTIN's Impala then proceed north on Troy Street from CREECH's residence. Surveillance units followed MARTIN to several locations, including 217 Westwood Avenue, Dayton, Ohio; Wright Brothers Elementary School located at 5758

9

Harshmanville Road, Huber Heights; and, 5606 Troy Street, Huber Heights, Ohio before the surveillance was terminated.

30.     At approximately 3:03 pm, the CI exited the residence and returned to the UC vehicle. The UC vehicle exited the property and proceeded back to a debrief location. The suspected methamphetamine was retrieved from the CI and placed into property at the Montgomery County Sheriff Office property room. The suspected methamphetamine was later sent to MVRCL for analysis. MVRCL report dated March 4, 2019 confirmed the substance submitted was in fact methamphetamine with a net weight of 83.99grams +/- 0.02 gram(s).

31.     During the phone calls between CREECH to MARTIN, the CI was able to observe the number **937-301-3961** on CREECH's phone.

32.     I obtained toll records for CREECH's number and that of the **SUBJECT PHONE**. Based on my review, CREECH and **SUBJECT PHONE** were in contact on February 13 and February 14, 2019, those being the day prior to and the day of the meet. The telephone records revealed that CREECH had contacted **SUBJECT PHONE** during the times when CREECH was believed to be in contact MARTIN.

33.     On or about February 19, 2019, at approximately 11:07 am, surveillance observed MARTIN's Impala park near the residence of 217 Westwood Avenue, Dayton, Ohio. MARTIN, who was wearing a red hooded sweatshirt, black pants and a black hat exited the driver's side of the vehicle.

34.     At approximately 2:15 pm, MARTIN was observed by surveillance entering the driver's side of his Impala, and he departed from the area shortly thereafter. SA Reed and I proceeded to the Wright Brothers Elementary School located at 5758 Harshmanville Road,

10

Huber Heights, Ohio, while FBI Task Force Officer (TFO) Pat Craun travelled to 5606 Old Troy
Pike, Huber Heights, Ohio in attempt to locate MARTIN's Impala.

35.     At approximately 2:49 pm, TFO Craun located MARTIN's Impala parked in a
covered carport at 5606 Old Troy Pike, Huber Heights, Ohio. A few minutes later, MARTIN's
Impala departed from the location.

36.     At approximately 3:05 pm, the Impala was observed by surveillance units parked
in a parking lot associated with the Wright Brothers Elementary School located at 5758
Harshmanville Road, Huber Heights, Ohio. While at this location, surveillance units observed
MARTIN exit the Impala and approach the school. After appearing to have picked up a young
child from the school, MARTIN re-approached the Impala and left the area with the child.

37.     At approximately 3:26 pm, officers from the Huber Heights police department
conducted a traffic stop on the Impala. The driver of the vehicle was identified as MARTIN. A
computer check of MARTIN's information revealed he was driving while under suspension.
MARTIN was given a verbal warning and released at the scene.

38.     On or about February 20, 2019, an administrative subpoena was served to DP&L
for utility subscriber information at 5606 Old Troy Pike, Huber Heights, Ohio.  On or about that
same date, DP&L responded that the address is subscribed to January D. Curry.

39.     On or about March 4, 2019, a computer search of the Dayton Police Department's
database revealed a Dayton Investigatory Report, dated July 30, 2010. According to the report, in
summary, on July 31, 2010, Dayton Police conducted a traffic stop of a red 2007 four door
Dodge vehicle bearing Ohio license plate ERY3519. The driver, later identified as MARTIN,
was arrested for Obstructing Official Business and Falsification by Dayton Police. The vehicle

11

registered owner was January D. Curry. The report further indicated Curry and MARTIN were boyfriend and girlfriend.

40.    On or about March 5, 2019, at the direction of ATF, the CI place a recorded cellular telephone call to CREECH, to further coordinate a methamphetamine purchase for the following day. During the course of the call, the CI indicated he/she would have the UC meet with CREECH at 2:00 pm on March 5, 2019. CI indicated that the UC would have $2500 in his/her possession. CREECH asked the CI, "It's all good right...?" CREECH explained he no longer lived at his previous address and indicated that the UC should meet with CREECH in the vicinity of Miller Lane near a Walmart (6465 York Commons Boulevard, Dayton, Ohio). At the conclusion of the phone conversation, CREECH confirmed that the CI wanted "five"; the CI acknowledged "five". The call concluded shortly thereafter.

41.    On or about March 6, 2019, I met with participating law enforcement officers and agents at a briefing location to discuss the operation. After the brief was complete, SA Reed and I, along with the UC, traveled to a separate location to meet with the CI. While at this location, the CI placed a several recorded cellular telephone call to CREECH, but obtained no answer. The UC had an electronic transmitting/recording device and prerecorded buy money to purchase the five ounces of methamphetamine.

42.    SA Reed and I surveilled the UC's vehicle from the staging location in the area of Walmart located at 6465 York Commons Boulevard. At approximately 2:30 pm, the UC arrived in the designated area on Miller Lane near Walmart. The UC attempted to contact CREECH, but received no answer. SA Reed and I decided to conduct a spot check at 2016 Troy Street to determine if we could locate CREECH.

12

43. At approximately 3:06 pm, SA Reed and I observed a white Chrysler mini-van known to be associated with CREECH at 2016 Troy Street, Dayton, Ohio.

44. At approximately 3:27 pm, SA Reed and I observed the white Chrysler mini-van depart 2016 Troy Street Dayton, Ohio and head to the Storage Inns of America located at 2121 Troy Street, Dayton, Ohio.

45. At approximately 3:44 pm, the UC received a call from the **937-559-8345**. The UC identified the caller to be CREECH. CREECH directed the UC to Storage Inns of America located at 2121 Troy Street, Dayton, Ohio.

46. At approximately 4:04 pm, SA Reed and I observed the UC's vehicle pull into the park in front of the Storage Inns of America's parking lot. UC called CREECH at the **937-559-8345**. The UC indicated he/she was out front of the storage facility. CREECH stated he would meet with the UC shortly.

47. At approximately 4:06 pm, surveillance observed a white male with a grey hoodie, later confirmed to be CREECH, enter the passenger side of the UC's vehicle. CREECH indicated that the source of the methamphetamine was on his way and would arrive in approximately 10-15 minutes. CREECH explained to the UC how to test methamphetamine for its quality. CREECH stated that he possessed a scale that the UC could utilize to verify the weight of the methamphetamine once it was delivered. The UC counted out the $2500 in pre-recorded buy money in front of CREECH.

48. The UC observed CREECH utilize his cellular telephone to send and receive text messages with the source of the methamphetamine multiple times during the undercover contact.

49. During the undercover contact between the UC and CREECH, CREECH expressed concern regarding the possibility that unknown persons were watching him

13

(CREECH) and the UC. Due to agent safety concerns, and while still operating in an undercover capacity, the UC made the decision to terminate the undercover contact and elected not to proceed with the purchase of methamphetamine from CREECH at this time.

50.     After CREECH and the UC parted from each other, CREECH called the UC from the **937-559-8345** multiple times in an effort to facilitate the methamphetamine transaction. CREECH also sent the UC a text message from the **937-559-8345** indicating, "everything was cool" and "we can still do this traffic."

51.     I also reviewed the telephone records of CREECH and **SUBJECT PHONE** on March 5 and March 6, 2019, the day prior to and the day of the meet. The telephone records revealed that CREECH had contacted **SUBJECT PHONE** during March 5 and March 6 and that contact occurred during times that CREECH was believed to be in contact with MARTIN.

52.     On or about March 19, 2019, the CI contacted CREECH's cell phone. During the course of the call, in summary, the CI advised CREECH the UC would be coming down the following day to make the purchase of methamphetamine and would meet CREECH at or near the Walmart. The call soon concluded.

53.     On or about March 20, 2019, I met with participating law enforcement officers and agents at a briefing location to discuss the operation. After the brief was complete, SA Reed and I, along with the UC, traveled to a separate location to meet with the CI. While at this location, the CI attempted to contact CREECH at **937-559-8345**, but obtained no answer. Over the course of several hours, the UC attempted to contact CREECH with no success. At approximately 5:02 pm, the CI received a text message from CREECH. In summary, CREECH advised the CI that he was sorry and did not hear his phone due to the fact he was asleep.

14

54.     I reviewed the telephone records of CREECH and **SUBJECT PHONE** on March 19 and March 20, 2019, the day prior to and the day of the meet. The telephone records revealed that **SUBJECT PHONE** had contacted CREECH on March 20.

55.     On or about May 22, 2019, at the direction of ATF, the CI contacted CREECH via text message at cellular telephone number **(937) 559-8345**. The CI initiated conversation through multiple text messages, indicating he wanted to meet with CREECH in person, in Dayton, Ohio, on May 23, 2019.

56.     On or about May 23, 2019, at the direction of ATF, the CI contacted CREECH via text message at cellular telephone number **(937) 559-8345**. The CI indicated he wanted to purchase four (4) ounces of methamphetamine from CREECH. CREECH acknowledged by messaging the response of "K". CREECH further indicated that he would meet with the CI at 211 N. Cherrywood Avenue, Dayton, Ohio.

57.     Continuing on that same date, prior to the initiation of the controlled undercover operation, ATF and FBI Agents, along with Dayton Police Department officers, conducted an operational briefing detailing the intent and parameters of the controlled undercover operation. Collective and individual operational responsibilities were specified during the operational brief.

58.     Prior to the initiation of the controlled undercover operation, the CI's person was searched for the presence/possession of narcotics, firearms or contraband items. No such items were found. The CI was provided with electronic transmitting/recording devices along with $2,000.00 in prerecorded government funds to purchase the methamphetamine.

59.     The CI and UC departed the staging location in the UC vehicle and proceeded 211 N. Cherrywood Avenue, Dayton, Ohio. At approximately 5:48 pm, the UC and CI arrived at the location. The UC parked the UC vehicle on Cherrywood Avenue, two houses north of

15

CREECH's residence, facing south. From this position, the UC could observe the front of the 211 N. Cherrywood Avenue.

60.    The CI exited the UC vehicle and approached 211 N. Cherrywood Avenue. While the UC remained in the vehicle, the UC observed the CI walk up the south, outside stairway at the front of the residence and then walk into the exterior, common walk-way/entrance leading to the upper apartments of the residence.

61.    A few moments later, the CI knocked on the door of 211 N. Cherrywood Avenue, Apt. 4. CREECH answered the door and let the CI into the apartment. When CREECH asked where the UC was, the CI indicated that the UC was parked down the street. CREECH stated, "I don't even know why I'm bugged about him…" CREECH indicated he did not want to deal with other people. The CI asked CREECH if he had obtained his own residence. CREECH explained that he had not yet obtained his own residence and stated, "That's why I'm still here…" The CI asked CREECH, "How long is it going to be…?" CREECH responded, "He should be here soon…"

62.    Approximately 6:00 pm, CREECH received an audible message notification on his cellular telephone. CREECH then placed a cellular telephone call. The unidentified recipient of CREECH's call answered and stated, "Coming up…" CREECH stated to CI, "I guess you better get some money counted out…"

63.    The CI asked CREECH, "How much… Five ($500)…? Four ($400) or Five ($500)…?" The CI counted out $2,000 in prerecorded government funds. The CI placed the prerecorded government funds on a table directly in front of CREECH

64.    At approximately 6:04 pm, the UC observed a dark blue Chevy Impala, similar to the Chevy Impala known by law enforcement to be driven by MARTIN, driving north on N.

16

Cherrywood Avenue. The UC observed the vehicle park directly in front of 211 N. Cherrywood Avenue, facing south. The UC observed MARTIN exit the Chevy Impala and approach 211 N. Cherrywood Avenue. The UC then observed MARTIN walk up the south, outside stairway at the front of the residence.

65.     At approximately 6:05 pm, CREECH received an audible message notification on his cellular telephone. CREECH then stated, "There's your guy…" CREECH walked to the front entry door as MARTIN entered. The CI greeted MARTIN and stated, "What's up…?" MARTIN replied, "What's going on…" CI stated "How you been…" MARTIN replied, "Doing alright." CREECH took a seat next to the CI in the front room of the residence. MARTIN stood in front of CREECH. MARTIN removed a white plastic bag from his front left pocket and held it in his left hand. CREECH handed the prerecorded government funds to MARTIN. MARTIN then took the government funds with his right hand. MARTIN took a seat holding both the white plastic bag and the government funds. MARTIN placed the white plastic bag on the table and counted the pre-recorded government funds. After a few minutes of conversation, MARTIN exited the residence.

66.     At approximately 6:09 pm, the UC observed MARTIN walking from the outside, common walk-way/entrance leading down from the upper apartments. The UC observed MARTIN continue down the south, outside stairway to the street and approach Chevy Impala, still parked in front of 211 N. Cherrywood Avenue. A few moments later, MARTIN left in the Chevy Impala.

67.     CREECH took the white plastic bag that had been placed on the table by MARTIN. CREECH opened the bag exposing five (5) separate clear plastic baggies, each

17

containing approximately one (1) ounce of a granule and crystalized substance, appearing semi-translucent in color (consistent with methamphetamine).

68.     CREECH stated, "There's five of them in there… Feel them… There nice huh…" The CI stated, "Which one you want… Take it… It's your choice…" CREECH removed one of the one (1) ounce baggies of suspected methamphetamine from the white plastic bag. The CI later explained in a post-operational debrief of the undercover purchase, that CREECH often took methamphetamine as payment from MARTIN for "middling" methamphetamine transactions. The CI secured the white plastic bag containing the remaining four (4), one (1) ounce baggies of suspected methamphetamine.

69.     At approximately 6:10 pm, the CI exited 211 N. Cherrywood Avenue. The UC observed the CI walk from the outside, common walk-way/entrance leading down from the upper apartments, continue down the south, outside stairway to the street and continue walking north to the UC's vehicle. The CI and UC departed the target area and proceeded back to the predetermined debrief location. Law enforcement took custody of the suspected methamphetamine from the CI and placed into property at the Dayton Police Department's property room. The suspected methamphetamine was later sent to the Miami Valley Regional Crime Laboratory (MVRCL) for analysis. MVRCL report dated June 14, 2019 confirmed the substance submitted was in fact methamphetamine with a gross weight of 116.47grams +/- 0.01 gram(s).

70.     On or about July 3, 2019, a computer search of the Huber Height's Police Department's database revealed an Incident Report, dated March 22, 2013. According to the report, in summary, on March 22, 2013, Huber Heights Police responded to a domestic complaint at 5606 Old Troy Pike, Huber Heights. Law enforcement met with January Curry

18

who described an argument she had with Cory MARTIN. Law enforcement obtained the phone number (**SUBJECT PHONE**) for MARTIN. Law enforcement made contact with MARTIN by phone and MARTIN acknowledged being at that residence related to the incident. MARTIN denied wrongdoing and advised he would be in contact with his attorney.

71.     I obtained toll records for CREECH's number and that of the **SUBJECT PHONE**. Based on my review, CREECH and **SUBJECT PHONE** were in contact with one another on May 23, 2019, the day of the meet. The telephone records revealed that CREECH had contacted **SUBJECT PHONE** during the times when CREECH was believed to be in contact MARTIN.

72.     On July 8, 2019, United States Magistrate Judge Sharon L. Ovington signed a federal search and seizure warrant for the requested information in 3:19MJ378. However, the signed warrant was not timely submitted and has expired. Thus, this application seeks the same information.

73.     In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records," range to tower (RTT), failed RTT, and text message content. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not

19

necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

74.     Based on my training and experience, I know that Sprint can collect cell-site data about the **SUBJECT PHONE**. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

75.     Based on my training and experience, I know that wireless providers such as Sprint typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Sprint typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **SUBJECT PHONE's** user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

76.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

20

77.     I further request that the Court direct Sprint to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Sprint, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

78.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

Dennis C. Eng
Special Agent
Federal Bureau of Investigation

9-4-19

Subscribed and sworn to before me on ~~July 8, 2019.~~

SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

21

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(937) 301-3961,** that are stored at premises controlled by Sprint ("the Provider"), headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **January 1, 2019 to April 30, 2019**:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

2

      viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

  b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

      i.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      ii.  information regarding the cell towers and sectors through which the communications were sent and received including range to tower (RTT) data, failed RTT data, and text message content.

## II.  Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21 U.S.C. §§ 841 and 846 involving Cory MARTIN during the period **January 1, 2019 to April 30, 2019**.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Sprint, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Sprint. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Sprint, and they were made by Sprint as a regular practice; and

b. such records were generated by Sprint's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Sprint in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Sprint, and at all times pertinent to the records certified here the process and system functioned properly and normally.

4

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                        Signature